UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JARED HESTER,

Plaintiff,

v.                                                    Civil Action No. 21-3166 (JEB)

PAUL PUBLIC CHARTER SCHOOL,

Defendant.

MEMORANDUM OPINION

*Pro se* Plaintiff Jared Hester enjoyed a brief but tumultuous tenure as a Spanish teacher at

Defendant Paul Public Charter School.  Following several months of performance struggles,

matters came to a head one February morning when, without notice, Hester failed to show up for

several of his classes and left his students without a teacher or supervisor.  The School

terminated his employment two days later, which prompted Plaintiff to bring this suit.  This

Court previously dismissed part of Hester's Complaint, but two types of claims remain.

Specifically, Plaintiff alleges that his employer violated the Americans with Disabilities Act by

denying his request for accommodations for his anxiety and PTSD; he also alleges that his

termination constituted improper retaliation for various protected activities.  The School now

moves for summary judgment.  As the Court concludes that Defendant neither violated the ADA

nor engaged in retaliatory acts, it will grant the Motion.

I.      Background

Before recounting this case's factual background, the Court must determine which facts

are disputed and which are not.  Local Civil Rule 7(h)(1) provides that the Court, in resolving

1

summary-judgment motions, "may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." A party asserting that a fact is disputed, moreover, "must support the assertion by citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations." Fed. R. Civ. P. 56(c)(1)(A).

Plaintiff contravened both rules. First, despite Local Rule 7's instruction, he filed no "statement of genuine issues" disputing the facts set forth by Defendant. See ECF No. 27 (Opp. to MSJ). Instead, he submitted an Opposition to Defendant's Motion, separately filed a lengthy compilation of records with no identification or indexing, see ECF No. 28 (Supplemental Memorandum), and then added a series of similarly unidentified "missing exhibits." ECF No. 29-1 to 29-5 (Missing Exhibits). Those submissions include no declarations or other attestations to their contents. The Opposition, meanwhile, which could have been construed as disputing the School's Statement of Facts, is deficient under Rule 56. None of the factual assertions it contains is supported by record evidence. This pleading admittedly includes citations to exhibits. But those cited exhibits, which are designated by letters, do not correspond to any of the exhibits that Plaintiff actually filed, which are designated by numbers. Compare Opp. at 2–4 (citing Exhibits A, C, D, E, F, and I), with Missing Exhibits (labeling docketed exhibits with numbers one through five).

As a result, to decipher Plaintiff's submissions and identify material disputed issues, "the court would have to . . . engage in time-consuming labor that is meant to be avoided through the parties' observance of" Local Rule 7 and Rule 56. Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 153 (D.C. Cir. 1996). But "[j]udges are not like pigs, hunting for truffles buried in" the record. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

While Hester may not be an attorney, he is still required to follow the federal and local rules of civil procedure. See, e.g., Moore v. Robbins, 24 F. Supp. 3d 88, 97 (D.D.C. 2014). The Court will therefore credit the facts set forth in Defendant's Statement of Material Facts as true. Joe Hand Promotions, Inc. v. Molly Malone's LLC, No. 19-3479, 2021 WL 4502073, at *1 (D.D.C. Oct. 1, 2021).

A. Factual Background

As relevant here, Plaintiff's story begins in October 2020 in the throes of the Covid-19 pandemic, when he was hired by Paul Public Charter School to be a high-school Spanish teacher. See ECF No. 25-2 (Def. SOMF), ¶ 3; ECF No. 25-3 (Affidavit of Pamela Merkerson), ¶ 4. Almost as soon as he started the job, Hester had trouble complying with the School's requirements for its teachers. For example, like all of his colleagues, he was required to submit for review a lesson plan for each of his classes so that the leadership team could monitor what was being taught and learned. See SOMF, ¶ 4; Merkerson Aff., ¶ 3. Given his lack of a "'track record' teaching at the School," Plaintiff's compliance was particularly important. See SOMF, ¶ 8; Merkerson Aff., ¶ 4. Yet Hester "was routinely late turning in required lesson plans[] and was failing to include the information necessary for a complete lesson plan." Merkerson Aff., ¶ 5; SOMF, ¶ 11. His supervisor, Assistant Principal Tomiko Graves, sent him numerous notices of tardiness or incompleteness from November 2020 to February 2021, and she also attempted to counsel and coach him. See SOMF, ¶ 13; ECF No. 25-4 (Graves Notices). Hester offered various excuses for his tardiness, including that "life happens" and "[s]ometimes stuff is late," and he also questioned the School's practice of requiring daily lesson plans as unnecessary. See SOMF, ¶¶ 12, 17; ECF No. 25-15 (Deposition of Jared Hester) at 50, 55.

In December 2020, perhaps seeking to partially address his performance issues, Hester requested an accommodation for anxiety and PTSD that would allow him to submit his lesson plans late.  See SOMF, ¶ 41; Merkerson Aff., ¶ 16.  His request was routed to Pamela Merkerson, the individual responsible for the School's human-resource functions, who called Plaintiff on December 20 seeking documentation of his underlying conditions and what accommodations they required.  See SOMF, ¶¶ 42–43; Merkerson Aff., ¶¶ 1, 16.  Weeks went by without Hester providing such documentation.  In early January, he emailed Merkerson to explain that while he had reached out to his psychiatrist about the issue, he had been unable to schedule an appointment.  See SOMF, ¶¶ 45–46; Hester Dep. at 37–38.

By late January 2021, Hester was in a tenuous position at the School.  He had been struggling for several months to meet basic expectations, and he had still not submitted documentation to support his contention that he needed accommodations to perform his job effectively.  The School therefore placed him on a Performance Improvement Plan.  See SOMF, ¶ 20; Merkerson Aff., ¶ 8.  The PIP contained goals and criteria designed to help Hester improve his performance.  See SOMF, ¶¶ 20–22; ECF No. 25-5 (PIP).  But in the period following his placement on a PIP, no such improvement manifested.  In fact, Plaintiff resisted the appropriateness and necessity of the PIP in the first place, as he believed he had been doing an "exceptional job."  SOMF, ¶¶ 23, 25, 72; Hester Dep. at 71, 96.

Merkerson, for her part, followed up with Hester in early February to ask if "there was any update on documents from [his] physician."  SOMF, ¶ 48; Merkerson Aff., ¶ 17.  Hester responded that "[l]ately [he had] not needed any accommodations," but that if he did need them, "they would be to have [his] camera off and to communicate with [his] students through chat rather than voice . . . and to have extensions on large batch assignments like more than the usual

amount of lesson plans in one week."  SOMF, ¶ 49; Merkerson Aff., ¶ 17.  Merkerson replied

that same day to reiterate the need for "documentation that explains the nature, severity, and

duration of [his] impairment . . . and why reasonable accommodations are needed."  SOMF,

¶ 50; ECF No. 25-10 (Merkerson-Hester Accommodation Emails) at 2.  "We look forward . . . to

working with you to address your requested accommodations from there," she continued.  See

Accommodation Emails at 2.

Around the same time of his exchanges with Merkerson and his placement on a PIP,

Hester decided to flip the script and express his frustrations with the School via a Letter of

Grievance he sent to the School CEO on February 1, 2021.  See ECF No. 25-11 (Letter of

Grievance).  The letter began by recounting a prior conversation between Plaintiff, Assistant

Principal Graves, and Principal Shalima Olorunoje during which Graves made several comments

that Hester deemed to be racist.  For example, she allegedly stated that "black and brown

children are visual learners" and "implied that [Hester's] race and linguistic background . . . were

the cause[s] of [her] concerns with [his] performance."  Id. at 1.  Later, during a meeting about

the incident held at Hester's request, Graves simply repeated her statements about learning

styles, and Olorunoje backed them up.  Id.  In his February letter, Hester criticized School

leadership for professing "racist beliefs" during the aforementioned interactions.  Id.

The letter also aired several other grievances, including: complaints about the Principal's

imposition of excessive constraints on his curricular choices, sometimes informed by her

allegedly racist views; disagreements with the PIP, which he requested be replaced "with a

legitimate plan that acknowledge[d] [his] authority as a language educator"; and frustration with

the School's lack of response to his request for accommodations like "extra time in turning in

large assignments and occasionally working with [his] camera off."  Id. at 1–2.

A week later, the School sent a reply that addressed each of Plaintiff's grievances.  See

SOMF, ¶ 64.  As for his complaint about his accommodations, Defendant explained that any

delay was attributable to Hester's dragging his feet in furnishing the documentation Merkerson

had asked for.  The School added, however, that it would "strive to assist with any

accommodations that were feasible."  ECF No. 25-12 (Response to Letter of Grievance) at 2; see

SOMF, ¶ 65.

Hester's performance issues, meanwhile, did not abate.  By mid-February 2021, he had

left a long trail of late submissions, incomplete lesson plans, and tardy postings of grades.  The

nadir of his tenure at the School, however, came on February 23.  That morning, he did not show

up for the homeroom he was covering.  See SOMF, ¶ 29; Merkerson Aff., ¶ 12.  Nor did he

appear for the first class he was teaching that day, or for the second.  Because Plaintiff had not

informed anyone of his absence, the School made multiple attempts to reach him throughout the

morning, but its calls went straight to voicemail.  See SOMF, ¶¶ 31, 36; Merkerson Aff., ¶ 13.

The students in his various morning classes, meanwhile, had logged on (classes were remote at

that point because of the pandemic) only to find that there was no teacher there and no one to

explain what had happened to him.  See SOMF, ¶ 30; Merkerson Aff., ¶ 12.  Hester finally

appeared for his third class of the day, but he was late.  See SOMF, ¶ 29; Merkerson Aff., ¶ 12.

Plaintiff eventually contacted the School at 10:21 that morning to explain that a medical

emergency had caused him to miss class.  See Merkerson Aff., ¶ 13; Hester Dep. at 81.  He later

elaborated on the nature of that "emergency."  He had taken a new-to-him drugstore treatment

for his anxiety the night before, and that "knocked [him] out completely cold and so [he] woke

up late."  Hester Dep. at 76–77.  In plain English, he overslept.  Id. at 81.  In addition, his

explanatory email came much too late.  Principal Olorunoje responded by informing him that his

failure to show up without notice was a "serious dereliction of [his] duties" and by reminding

him of the Employment Manual's strict intolerance for no-shows:

> If an employee fails to report to work without proper notification to
> his or her supervisor, the School may consider that employee to have
> abandoned his/her employment and has voluntarily terminated the
> employment.  <u>In such cases, the School will provide notice to the
> employee that his or her employment has terminated</u>.

ECF No. 25-6 (Feb. 23 No-Show Email) at 1 (quoting ECF No. 25-8 (Employment Manual))

(emphasis added).  She also scheduled a meeting with him for later that week.  Unbeknownst to

Hester, the School made the decision to terminate Hester's employment that same day.  <u>See</u>

SOMF, ¶ 37; Merkerson Aff., ¶ 14.

On February 24, the next day, Hester sent an email to Merkerson with the long-awaited

documentation relating to his accommodations request.  <u>See</u> SOMF, ¶ 53; Merkerson Aff., ¶ 20.

The attached note from his medical provider explained that Plaintiff had been diagnosed with

"Anxiety Disorder," which qualified him for an accommodation of "Emotional Support breaks"

— that is, "4 (10 minute) breaks every 2 hours during his work day."  ECF No. 25-13 (Feb. 24

Medical Documentation) at 2.  In his email, Plaintiff also asked if Merkerson needed a letter

explaining his absence the day before, "which was due to a medical issue."  <u>Id.</u> at 1.

All of this was too little, too late.  At his meeting with Principal Olorunoje on February

25, Hester was informed that his employment was terminated effective immediately.  <u>See</u> ECF

No. 25-9 (Feb. 25 Meeting Notes).  Olorunoje explained that while his failure to report for

scheduled classes on February 23 would have been unacceptable in any circumstance, "the fact

that [he] engaged in this conduct while under a PIP [whose requirements he was already failing

to meet was] simply not tolerable."  <u>Id.</u>  The School concluded that it did not have "confidence in

[his] ability to represent the School, or to provide [its] Students with the safe, reliable and productive work environment required." Id.

      B.  Procedural History

After he was fired, Hester filed this *pro se* action against the School to challenge his termination on a number of grounds. "Nowhere [in his Complaint did he] specifically set out his counts, but the Court, reading his *pro se* Complaint liberally, could infer that he [sought] to bring claims under Title VII and the Americans with Disabilities Act for race, national-origin, and disability discrimination; a failure to accommodate his disability; and retaliation for protected activity regarding race, national origin, and disability." Hester v. Paul Pub. Charter Sch., No. 21-3166, 2022 WL 35620, at *2 (D.D.C. Jan. 4, 2022).

Defendant filed a Motion to Dismiss the Complaint, which this Court granted in part. Id. at *3. Specifically, the discrimination counts were dismissed, but the retaliation and failure-to-accommodate claims survived. Id. Discovery concluded in September 2022, and the School has now filed a Motion for Summary Judgment. See Minute Order of June 8, 2022; ECF No. 25-1 (MSJ).

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Liberty Lobby, Inc., 477 U.S. at 247–48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248. A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, Inc., 477 U.S. at 248. "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

### III.   Analysis

The Court will begin by considering Plaintiff's failure-to-accommodate claims and will then evaluate his retaliation claims.

#### A.   Failure to Accommodate

The ADA forbids covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Id. § 12112(b)(5)(A). To establish a failure-to-accommodate claim, Plaintiff must show that: (1) he was disabled within the meaning of the ADA; (2) the School was aware of his disability; (3) he could have done his job with reasonable accommodations; and (4) he was denied such accommodations. Id. § 12112(a), (b)(5)(A); Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994).

Hester contends that the School violated the ADA by refusing to accommodate his disabilities, which were anxiety disorder and PTSD. See Opp. at 4. Defendant counters that this claim founders for at least two independent reasons: first, because Plaintiff has not shown that he had a covered disability for ADA purposes, and second, because the School never denied the accommodations he requested. See MSJ at 12–16, 17–19. The Court agrees with both propositions.

1. *Disability Under ADA*

"[A] plaintiff is disabled under the ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial." Haynes v. Williams, 392 F.3d 478, 481–82 (D.C. Cir. 2004). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Hester claims to suffer from two impairments: anxiety disorder and PTSD. See Opp. at 4. But he never argues — let alone introduces evidence — that those impairments limit a major life activity, much less that such limitation is substantial, despite it being his burden to do so. Haynes, 392 F.3d at 485. At the summary-judgment stage, that means that he is out of luck. Id. ("The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment."); see also Massaquoi v. D.C., 81 F. Supp. 3d 44, 55 (D.D.C. 2015) (dismissing claim for failure to accommodate anxiety disorder because plaintiff offered no facts to show he was substantially limited in major life activity).

Perhaps Hester meant to suggest that his impairments limit some component of the major life activity of "working." 42 U.S.C. § 12102(2)(A). Even if he had presented such a theory, though, it would not carry the day. "[T]o establish substantial limitation of working activity under the ADA," it is not enough for a plaintiff to show he is excluded from a particular job; he "must allege and prove that in his particular circumstances, taking into account the appropriate factors, his impairment prevents him from performing a substantial class or broad range of jobs otherwise available to him." Duncan v. Washington Metro. Area Transit Auth., 240 F.3d 1110, 1115 (D.C. Cir. 2001) (*en banc*) (emphasis added) (internal quotations omitted).

10

Hester's own description of his impairments, however, suggests that far from excluding him from a substantial class of jobs, his anxiety and PTSD merely precluded him from successfully performing duties that were unique to a particular job at a particular school in D.C. during a pandemic.  For example, Plaintiff explains that he had trouble completing his many lesson plans on time and staying on camera during his online classes.  See Opp. at 5.  Notably absent from his pleading is any suggestion that he was otherwise more broadly limited by his impairments.  Absent such an explanation, this Court is constrained to infer that Hester's anxiety and PTSD interfered only with his ability to comply with specific policies at Paul Public Charter (*e.g.*, deadlines for lesson-plan submission and pandemic teaching protocol), and not with his ability to perform a broad range of jobs.

To be sure, the fact that Hester requested emotional-support breaks gets him a bit closer to the required showing, see Feb. 24 Medical Doc. at 3, as it suggests that he might be excluded from most traditional teaching jobs.  After all, one is hard pressed to imagine a teaching schedule that could regularly accommodate four ten-minute breaks every two hours.  But this Court cannot speculate on Plaintiff's behalf.  It remains his burden to provide evidence that the extent of his exclusion from the teaching market due to his impairment would be substantial relative to the jobs for which he is otherwise qualified.  See, e.g., Duncan, 240 F.3d at 1115 ("At most [plaintiff's] testimony shows that he was not qualified for the particular kind of job — truck driver — for which he chose to apply.  It tells us nothing about whether he was qualified for the many other jobs in the Washington metropolitan employment pool.").  As he has not done so, no reasonable jury could find that Hester has a disability under the ADA.

2. *Denial of Accommodations*

Regardless of proof of his disability, Hester also cannot satisfy the fourth requirement of

an ADA claim because the School never denied his request for an accommodation.

When an employee seeks an ADA accommodation, he and his employer "may need to

engage in an 'interactive process' in order to identify and implement a workable

accommodation." Mogenhan v. Napolitano, 613 F.3d 1162, 1167 (D.C. Cir. 2010).  To then

"establish that [a] request [for accommodations] was denied, [a plaintiff] must show either that

the [employer] in fact ended [that] interactive process or that it participated in the process in bad

faith." Minter v. D.C., 809 F.3d 66, 69 (D.C. Cir. 2015) (internal quotations omitted).

Here, the undisputed facts confirm the contrary — namely, that the School engaged with

Hester on his need for accommodations in good faith, and that it was he, not the School, who

prevented the "interactive process" from moving further.  Recall the course of the parties'

conversations about the issue.  The interactive process began in December 2020 when Plaintiff

submitted his accommodation request.  Merkerson responded by asking for further

documentation of the required accommodations.  See SOMF, ¶¶ 42–43; Merkerson Aff., ¶¶ 1,

16.  Such demands for more information are "entirely appropriate" in contexts like this one.

Stewart v. St. Elizabeths Hosp., 589 F.3d 1305, 1309 (D.C. Cir. 2010).  The applicable

regulation provides that "[w]hen the need for an accommodation is not obvious, an employer,

before providing a reasonable accommodation, may require that the individual with a disability

provide documentation of the need for accommodation."  Id. (quoting 29 C.F.R. pt. 1630 app.

§ 1630.9).  That is exactly what Merkerson did.  Plaintiff, however, was unresponsive.

After over a month had gone by, Merkerson followed up with Plaintiff for an update.  See

SOMF, ¶ 48; Merkerson Aff., ¶ 17.  Hester came back with a confusing response: he explained

that he had not been needing accommodations lately, but then offered examples of

accommodations he might someday require.  See SOMF, ¶ 49; Merkerson Aff., ¶ 17.  That email

is most reasonably interpreted as an abandonment of his request for accommodations, thus

negating any suggestion that it was the School that ended the interactive process.  Even were this

Court to assume otherwise, however, Merkerson's reply would confirm that the School never

denied his request.  Quite the opposite: Merkerson explained that if Plaintiff wished to pursue

this any further, the School would happily continue to work with him once he submitted

documentation about the nature of his impairment.  See Accommodation Emails at 2.  The

School reiterated that sentiment once more on February 8 in response to Hester's Letter of

Grievance.  See Response to LOG at 3.  Hester responded to that with silence, once again

suggesting that he had abandoned his request.  At the end of the day, it is clear that at no point in

those interactions did the School ever suggest that it was denying the request.

On February 24, Plaintiff finally submitted the requisite documentation and with it a

request for emotional-support breaks, an accommodation that he had not previously sought.  See

SOMF, ¶ 53.  That email thus appeared to initiate a new request and interactive process (or

perhaps renewed his previously abandoned one).  Either way, though, it could not form the basis

for a failure-to-accommodate claim.  By this date, the uncontested facts are that the School had

already decided to terminate Hester's employment, and it delivered the news to him the very next

day.  Id., ¶¶ 37, 40; Merkerson Aff., ¶ 20.  Defendant therefore had no opportunity to deny the

February request, much less to engage in a new interactive process.

In sum, the School — via Merkerson — diligently worked with Plaintiff on his request

for accommodations until he arguably retracted it.  Merkerson even tried to continue the

conversation after that retraction.  She did so in good faith, seeking from Hester only additional

information that employers commonly and permissibly seek in situations like this one.  By the time Hester renewed his request with the requisite support, the School had already decided to terminate him and so had no opportunity to properly engage with him.  The Court therefore concludes that no jury could find that Plaintiff satisfies the fourth requirement for a failure-to-accommodate claim.

      B.  <u>Retaliation</u>

      Hester next alleges that the School terminated his employment in retaliation for his Letter of Grievance and request for accommodations.  <u>See</u> Opp. at 1.  Although he never invokes a statutory basis, the Court presumes that he brings these claims under Title VII and the ADA.

      Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice" under the statute.  <u>See</u> 42 U.S.C. § 2000e-3(a).  The ADA, similarly, prohibits retaliation against employees who "opposed any act or practice made unlawful" by the Act.  <u>See</u> 42 U.S.C. § 12203(a).  In cases like this one where there is no direct evidence of retaliation, the three-part burden-shifting framework set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 802–05 (1973), applies.  <u>See</u> <u>McGrath v. Clinton</u>, 666 F.3d 1377, 1383 (D.C. Cir. 2012); <u>Smith v. D.C.</u>, 430 F.3d 450, 455 (D.C. Cir. 2005) (applying <u>McDonnell-Douglas</u> to ADA retaliation claim).

      Under that framework, the plaintiff has the initial burden of showing: "(1) that he opposed a practice made unlawful by [statute]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action because the employee opposed the practice."  <u>McGrath</u>, 666 F.3d at 1380 (internal quotation marks omitted).  "Such a showing raises a rebuttable presumption of unlawful discrimination and shifts to the defendant the burden to rebut the presumption by asserting a legitimate, non-discriminatory reason for its actions."

14

Smith, 430 F.3d at 455 (internal quotations omitted).  If the defendant offers such a reason, the

Court "must decide whether a reasonable jury could infer intentional discrimination from the

plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions

were discriminatory or that the non-discriminatory justification was pretextual."  Id. (internal

quotations omitted).

Defendant argues that even assuming that Hester has made out a *prima facie* case, the

School should prevail because it had a legitimate, non-discriminatory reason for terminating him:

his "no call no show" on February 23 coupled with his poor performance in the months prior.

See MSJ at 33–38.  The Court agrees and will grant the Motion as to these claims, too.

1. *Letter of Grievance*

Hester's primary theory is that the School retaliated against him via termination after he

"complained internally about [School leadership's] use of inaccurate race-based pedagogy and

their profession of racist beliefs about [him] and [his] students."  Opp. at 1.

The undisputed facts show otherwise: the School terminated Plaintiff because of his

unacceptable performance on the job.  Specifically, the record is replete with evidence that

Defendant fired him because he failed to show up for homeroom and multiple classes even after

he was placed on a PIP, and because he had a long track record of significant and unaddressed

performance issues.  For example, Merkerson, who is in charge of the School's HR functions,

explained in her affidavit that the School decided to terminate Hester on February 23, the day of

his no show.  See Merkerson Aff., ¶¶ 1, 14.  That timing aligns with the School's explanation

that his absence caused School leadership to lose any remaining confidence it had in Hester.  The

Principal's email to him that same day corroborates this position.  In her email, Olorunoje

expressed her grave concern with Hester's absence.  She also quoted from the School's

15

employee manual, which states in no uncertain terms that if an employee does not report to work and does not notify the School of his absence, "the School will provide notice to the employee that his or her employment has terminated." Merkerson Aff., ¶ 13.  What happened here is exactly what the manual prescribes: the School provided notice to Hester that his employment was terminated after his no call, no show.

Finally, contemporaneous notes from the meeting at which Hester was informed of his termination confirm the veracity of Defendant's explanation.  Those records show that Olorunoje communicated the following to Hester: in light of his performance issues, placement on a PIP, resistance to that PIP, failure to comply with its goals (progress towards which was "necessary for continued employment"), and subsequent failure to show up for two classes and a homeroom session, the School no longer had "confidence in [his] ability to represent the School, or to provide [] Students with the safe, reliable and productive work environment required."  Feb. 25 Meeting Notes.  His behavior, the Principal explained, was "simply not tolerable."  Id. Olorunoje made no mention of his Letter of Grievance or of any other complaint Hester had lodged with the School.

Plaintiff, for his part, offers no evidence to suggest that this legitimate, non-discriminatory reason is pretext.  The only conceivable basis he might point to is the temporal proximity between his Letter and his termination.  But if proximity is the touchstone, the School's explanation would be a far more plausible reason for the termination.  After all, it decided to let Hester go the same day of his no call, no show.  By contrast, the School let him continue his employment for weeks after he sent his Letter of Grievance.  In light of that fact, and given the overwhelming evidence just canvassed, the Court concludes that no reasonable jury could find that Hester was terminated in retaliation for his Letter of Grievance.

2.  *Request for Accommodations*

Plaintiff also suggests, but never explicitly asserts, that his termination was in retaliation for his request for accommodations.  That theory comes up short for the same reasons as did his other retaliation claim.  The undisputed facts confirm that Hester was fired because he did not show up for multiple classes on February 23, and because his unexplained absence compounded a long trail of performance problems.  See supra section III.B.1.  Once again, Hester offers no evidence that this explanation is pretextual, and the record divulges no connection between his requests — both the earlier withdrawn one and the later one — and his firing.  Indeed, as just described, the decision to terminate Plaintiff occurred on February 23, the day before he renewed his accommodations request with the requisite documentation.  A subsequent event cannot be the cause of a decision made previously.

In sum, there is no genuine dispute that Plaintiff was terminated for his poor performance, and not in retaliation for any request for accommodations.

IV.    **Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 23, 2023